**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

STATE OF NEW JERSEY, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF NEW YORK, COMMONWEALTH OF MASSACHUSETTS, CITY OF NEW YORK,

                Plaintiffs,

        v.

ANDREW R. WHEELER, *Administrator of the United States Environmental Protection Agency*, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

                Defendants.

No. 20 Civ. 1425 (JGK)

---

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF**
**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2737
Fax:  (212) 637-2702
Email: lucas.issacharoff@usdoj.gov

LUCAS ISSACHAROFF
Assistant United States Attorney
– Of Counsel –

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ................................................................................................................. 4

    I.   Statutory and Regulatory Background ................................................................... 4

        A.  Good Neighbor Obligations and Implementation Plans ................................. 4

        B.  The 2008 NAAQS and the CSAPR Update ..................................................... 5

        C.  The Close-Out Rule .......................................................................................... 8

    II.  The *Wisconsin* and *New York* Litigation ............................................................... 9

    III. Procedural History ............................................................................................... 12

ARGUMENT ..................................................................................................................... 13

    I.   This Court Lacks Jurisdiction over Plaintiffs' Claim ......................................... 13

        A.  EPA Fulfilled Its Statutory Obligations to Promulgate FIPs for the 2008 NAAQS ... 14

        B.  The *Wisconsin* Remand Eliminated Any Mandatory Duty to Promulgate Further Revised FIPs .................................................................................................. 15

        C.  Absent a Mandatory Duty, This Court Lacks Jurisdiction over Plaintiffs' Claim ...... 17

    II.  Plaintiffs' Proposed Schedule Is Unreasonable ................................................. 20

        A.  Legal Standard ................................................................................................ 21

        B.  Plaintiffs' Proposed Schedule Is Unfeasible .................................................. 22

        C.  EPA's Proposed Schedule ............................................................................... 24

CONCLUSION .................................................................................................................. 29

# TABLE OF AUTHORITIES

## Cases

*Am. Hosp. Ass'n v. Price*,
    867 F.3d 160 (D.C. Cir. 2017) ................................................................................... 21
*Burns v. Dep't of Health & Human Servs.*,
    No. 1:19-CV-2246 (CM), 2019 WL 4933452 (S.D.N.Y. Oct. 4, 2019) ................................ 20
*Cronin v. Browner*,
    90 F. Supp. 2d 364 (S.D.N.Y. 2000) ........................................................................... 21
*Doe v. Civiletti*,
    635 F.2d 88 (2d Cir.1980) ........................................................................................ 19
*Envtl. Def. Fund, Inc. v. Gorsuch*,
    713 F.2d 802 (D.C. Cir. 1983) ................................................................................... 15
*Envtl. Def. Fund v. EPA*,
    852 F.2d 1316 (D.C. Cir. 1988) ................................................................................. 18
*Envtl. Def. Fund v. Thomas*,
    627 F. Supp. 566 (D.D.C. 1986) ................................................................................ 21
*Envtl. Integrity Project v. U.S. Envtl. Prot. Agency*,
    160 F. Supp. 3d 50 (D.D.C. 2015) ............................................................................. 18
*FDIC v. Meyer*,
    510 U.S. 471 (1994) ................................................................................................ 17
*Garcia v. Akwesasne Hous. Auth.*,
    268 F.3d 76 (2d Cir. 2001) ....................................................................................... 13
*Hollingsworth v. Perry*,
    558 U.S. 183 (2010) ................................................................................................ 20
*Illinois v. Gorsuch*,
    530 F. Supp. 337 (D.D.C. 1981) ................................................................................ 15
*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ................................................................................................ 17
*Lipkin v. S.E.C.*,
    468 F. Supp. 2d 614 (S.D.N.Y. 2006) ......................................................................... 17
*Mack v. United States*,
    814 F.2d 120 (2d Cir. 1987) ..................................................................................... 19
*Maryland v. Pruitt*,
    320 F. Supp. 3d n.8 ................................................................................................. 21
*New York v. Envtl. Prot. Agency*,
    781 F. App'x 4 (D.C. Cir. 2019) ...................................................................... 1, 2, 12
*New York v. Pruitt*,
    No. 18-CV-406 (JGK), 2018 WL 2976018 (S.D.N.Y. June 12, 2018) ................................ 16
*Pub. Citizen Health Research Grp. v. Brock*,
    823 F.2d 626 (D.C. Cir. 1987) ................................................................................... 18
*Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*,
    No. 1:18-CV-02035 (TNM), 2020 WL 1065406 (D.D.C. Mar. 5, 2020) ............................. 20

*Sierra Club v. Jackson*,
    724 F. Supp. 2d 33 (D.D.C. 2010) ........................................................ 17
*Sierra Club v. Johnson*,
    444 F. Supp. 2d 46 (D.D.C. 2006) ........................................................ 21
*Sierra Club v. Pruitt*,
    238 F. Supp. 3d 87 (D.D.C. 2017) ........................................................ 21
*Sierra Club v. Thomas*,
    658 F. Supp. 165 (N.D. Cal. 1987) ....................................................... 21
*Sierra Club v. Thomas*,
    828 F.2d 783 (D.C. Cir. 1987) ............................................................. 21
*Sierra Club v. Wheeler*,
    956 F.3d 612 (D.C. Cir. 2020) ............................................................. 17
*Valero Energy Corp. v. EPA*,
    927 F.3d 532 (D.C. Cir. 2019) ............................................................. 17
*Vt. Yankee Nuclear Power Corp. v. NRDC*,
    435 U.S. 519 (1978) ........................................................................... 18
*Wisconsin v. Envtl. Prot. Agency*,
    938 F.3d 303 (D.C. Cir. 2019) ........................................................ passim

**Statutes**

28 U.S.C. § 1331 ..................................................................................... 19
28 U.S.C. § 1361 ..................................................................................... 19
42 U.S.C. § 7410 ............................................................................. 4, 5, 14
42 U.S.C. § 7604 ................................................................. 13, 17, 18, 19
42 U.S.C. § 7607 ....................................................................................... 9

**Regulations**

40 C.F.R. § 51.1103 .................................................................................. 7
73 Fed. Reg. 16,436 ................................................................................. 5
81 Fed. Reg. 74,504 ............................................................................ 6, 19
83 Fed. Reg. 65,878 ............................................................................ 8, 19

## PRELIMINARY STATEMENT

Plaintiffs ask this Court to impose a deadline for the Environmental Protection Agency ("EPA") to respond to the D.C. Circuit's opinion remanding in part certain aspects of EPA's rules implementing the Clean Air Act's ("Act") "Good Neighbor Provision" as it relates to ozone emissions. But the Act's citizen suit provision is only available to enforce mandatory duties where there is a date-certain statutory deadline by which EPA must act. Using the citizen suit provision to *impose* a novel deadline on EPA's compliance with another court's remand is improper and not within the Act's waiver of sovereign immunity. The D.C. Circuit has already made clear that the proper remedy if EPA fails to act timely is to return to the D.C. Circuit on a mandamus writ. It may be—and this Court need not decide—that Plaintiffs would also have a remedy in the district court for the District of Columbia under the Act's "unreasonable delay" provision, a provision that does not provide jurisdiction in this Court. The Court should reject Plaintiffs' effort to circumvent this process and statutory scheme and have *it* decide the timing of EPA's response to the D.C. Circuit's decisions.

This dispute arises from EPA's 2016 rulemaking to address upwind states' Good Neighbor obligations—i.e., upwind states' obligations not to significantly contribute to excess ozone in downwind states. This rulemaking is known as the Cross-State Air Pollution Rule Update, or the "CSAPR Update." At the time of the CSAPR Update, EPA believed that it only partially addressed the Act's Good Neighbor requirements, and EPA acknowledged publicly that a follow-on rulemaking would be required to address fully those requirements. In that subsequent rulemaking—known as the Close-Out Rule—EPA ultimately determined based upon updated modeling that no additional Good Neighbor requirements needed to be imposed.

The CSAPR Update and the Close Out-Rule were both challenged in the D.C. Circuit. *See respectively Wisconsin v. Envtl. Prot. Agency*, 938 F.3d 303 (D.C. Cir. 2019) ("*Wisconsin*"); *New*

*York v. Envtl. Prot. Agency*, 781 F. App'x 4 (D.C. Cir. 2019) ("*New York*").  In *Wisconsin*, while generally upholding the CSAPR Update, the D.C. Circuit held that the CSAPR Update was deficient insofar as it failed to align Good Neighbor obligations with the next ozone "attainment date," nor demonstrating the impossibility of doing so.  This meant EPA was obligated to address fully its Good Neighbor obligation in the CSAPR Update, rather than multiple actions that extended beyond the applicable attainment date.  The D.C. Circuit remanded without vacatur, leaving the CSAPR Update in place while EPA engaged in remedial rulemaking.  In doing so, the D.C. Circuit expressly declined certain petitioners' request to impose a six-month deadline on the agency's response, instead noting that EPA's action on remand could not be "indefinite," and that mandamus was available if EPA failed to comply with the Court's remand.  *Wisconsin*, 938 F.3d at 336-37.

Subsequently, on review of the Close-Out Rule, the D.C. Circuit held in *New York* that because "the Close-Out Rule relied upon the same statutory interpretation of the Good Neighbor Provision that we rejected in *Wisconsin*, . . . the agency's defense of the Close-Out Rule in these cases is foreclosed," and therefore vacated the Close-Out Rule.  Yet once again, the court declined the request of petitioners (this time including each of the instant Plaintiffs) to impose a deadline for the revised rulemaking that would be required to address the *Wisconsin* remand.  *New York*, 781 F. App'x at 6-7.

Following the *Wisconsin* and *New York* holdings, no mandatory duty to act by a statutory deadline remains.  The duty was discharged by the CSAPR Update and then addressed in *Wisconsin*.  It is still discharged; the CSAPR Update remains in effect.  What remains is for EPA to remedy the substantive defect identified by the *Wisconsin* Court.  The duty EPA previously believed to be outstanding and that was discharged and then addressed by the D.C. Circuit in *New*

*York*—to promulgate a complete rulemaking (the Close-Out Rule) following the initial partial rulemaking (the CSAPR Update)—*no longer exists*, because the *Wisconsin* Court made clear that the initial rulemaking should have been complete, and now, on remand, must be made complete (subject to the legal standards that court articulated).

Accordingly, no remaining mandatory duty, based upon an outstanding statutory deadline, exists, and no suit to enforce a non-existent duty can be brought.  As EPA explained to the D.C. Circuit, the revision of the CSAPR Update required by the *Wisconsin* remand will fully address the remaining Good Neighbor obligations, obviating the need for a new "Close-Out Rule" to satisfy any mandatory duty of EPA.  The CSAPR Update is before the agency on the D.C. Circuit's remand.  EPA must respond to the D.C. Circuit in a timely fashion, but whether it has done so is a matter for a mandamus petition in the D.C. Circuit or, arguably, an unreasonable delay suit in the District of Columbia.  Plaintiffs' purported "mandatory duty" claims in this case must therefore be rejected.

Alternatively, if this Court determines that it may exercise jurisdiction, it should reject Plaintiffs' proposed schedule.  Given the complexity of issues that must be addressed in conducting an updated Good Neighbor analysis under EPA's longstanding regional framework and promulgating any necessary revisions, Plaintiffs' proposed schedule does not afford sufficient time for the necessary analytical and procedural steps.  In contrast, EPA's anticipated rulemaking schedule provides for the most expeditious possible rulemaking to implement any necessary near-term and long-term emission controls and to ensure a sound, defensible rule.

**BACKGROUND**

I.    **Statutory and Regulatory Background**

A.    **Good Neighbor Obligations and Implementation Plans**

Under Section 110 of the Clean Air Act, 42 U.S.C. § 7410, EPA's promulgation or revision of a national primary ambient air quality standard (NAAQS) triggers a series of steps designed to bring air quality across the country into compliance with those standards.  Broadly speaking, EPA must identify whether areas are meeting those standards, and states or EPA must implement plans designed to address areas that are not meeting the standard, either within the states or in states upwind from them.

Once EPA promulgates a NAAQS, EPA must designate areas as being in "attainment" or "nonattainment" of the NAAQS, or "unclassifiable."  *Id.* § 7407(d).  For ozone, nonattainment is further split into five classifications based on the severity of the violation—Marginal, Moderate, Serious, Severe, or Extreme.  Higher classifications provide States with progressively more time to attain and additional control requirements.  *Id.* §§ 7511, 7511a.  In general, states with nonattainment areas classified as Moderate or higher must submit plans to EPA to bring these areas into attainment according to the statutory schedule.  *Id.* § 7511a.  If an area fails to attain the NAAQS by the attainment date associated with its classification, it is "bumped up" to the next classification.  *Id.*

Separately, all states must submit State Implementation Plans (SIPs) within three years of promulgation of a NAAQS that, *inter alia*, address emissions that will "contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such

4

national primary or secondary ambient air quality standard."  *Id.* § 7410(a)(2)(D)(i)(I) (the "Good Neighbor Provision").[1]

Once a state submits a Good Neighbor SIP, EPA must determine whether the submission meets certain minimum completeness criteria, defined at 42 U.S.C. § 7410(k)(1)(A).  If a SIP is deemed complete, EPA then proceeds to review whether the SIP complies with the CAA's substantive requirements and either approves or disapproves the SIP.  *Id.* § 7410(k)(2), (3).  Where EPA either finds that a state has failed to make a complete submission or substantively disapproves it in whole or in part, such actions trigger an obligation for EPA to promulgate a Federal Implementation Plan (FIP) within two years unless the state provides, and EPA approves, an adequate SIP prior to promulgating the FIP.  *Id.* § 7410(c)(1).

### B.      The 2008 NAAQS and the CSAPR Update

On March 12, 2008, the EPA promulgated a revision to the NAAQS, lowering both the primary and secondary standards for ozone to 75 ppb.  *See* National Ambient Air Quality Standards for Ozone, Final Rule, 73 Fed. Reg. 16,436 (March 27, 2008) ("2008 NAAQS").  These revisions of the NAAQS, in turn, triggered a 3-year deadline of March 12, 2011, for states to submit SIP revisions addressing infrastructure requirements under CAA Sections 110(a)(1) and 110(a)(2), including the Good Neighbor Provision.  *See* Idsal Decl. ¶ 50.  EPA concluded that Illinois, Michigan, Pennsylvania, Virginia, and West Virginia (among others) failed to submit complete

---

[1] This provision has two "prongs": significant contribution to nonattainment and interference with maintenance.  EPA gives independent significance to both prongs.  Idsal Decl. ¶ 39.  In general, for simplicity in this brief, EPA refers to both obligations as the requirement to eliminate "significant contribution."

SIPs, and disapproved the Good Neighbor SIP submissions of Indiana and Ohio.  *Id.* ¶¶ 53-56. These findings obligated EPA to issue FIPs or approve SIPs for these states on or before August 12, 2017 (Illinois, Michigan, Pennsylvania, Virginia, and West Virginia) and July 15, 2018 (Indiana and Ohio) (hereinafter, collectively, the "Upwind States").

In 2016, EPA issued the Cross-State Air Pollution Rule Update (CSAPR Update).  81 Fed. Reg. 74,504.  The CSAPR Update both addressed a prior rulemaking's remand and implemented the Good Neighbor Provision as to the 2008 ozone NAAQS.  Idsal Decl. ¶ 57.  The CSAPR Update used EPA's established four-step framework for addressing the Good Neighbor Provision: (1) identifying downwind receptors expected to have problems attaining or maintaining clean air standards (i.e., the 2008 NAAQS); (2) determining which upwind states contribute to these problems in amounts sufficient to "link" them to the downwind air quality problems; (3) for states linked to downwind air quality problems, identifying upwind emissions that significantly contribute to nonattainment or interfere with maintenance of a standard; and (4) for states found to have emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, implementing reductions through an enforceable program.  *Id.* at ¶¶ 57-61.  Utilizing this framework, EPA promulgated FIPs for 22 upwind states (including the seven Upwind States at issue here).  *Id.* at ¶ 61.

Two features of the CSAPR Update are particularly relevant to this litigation.  First, EPA focused on emissions reductions that could be achieved by the beginning of the 2017 ozone season, but had not purported to make an "impossibility" showing as to implementing emission reductions

by the July 2018 Moderate area attainment date, *see* 40 C.F.R. § 51.1103.[2]  Accordingly, EPA declined to impose emission controls that could not be implemented by the 2017 ozone season. Thus, EPA found that while additional emissions reductions may be achievable from electric generating units (EGUs) with the installation of post-combustion controls, such controls require several years to install, could not be implemented by the 2017 ozone season, and therefore were not required in the CSAPR Update.  *See* Idsal Decl. ¶ 60.

Second, EPA did not quantify non-EGU stationary source emissions reductions to address interstate ozone transport for the 2008 ozone NAAQS in the CSAPR Update.  This was for two reasons.  First, EPA explained that there was greater uncertainty regarding potential reductions of emissions from non-EGU sources, and that more time would be required for states and EPA to gather necessary data and evaluate pollution control strategies before EPA could develop emission reduction obligations for these sources.  *Id.* ¶ 65.  Second, EPA explained that it did not believe that significant, certain, and meaningful non-EGU $NO_X$ reduction[3] was in fact feasible for the 2017 ozone season.  *Id.*

As a result of these two choices, EPA (1) determined that the FIPs issued as part of the CSAPR Update would only partially fulfill its obligations to address 22 upwind states' Good Neighbor obligations, and (2) acknowledged an obligation to evaluate whether it would be

_____

[2] EPA aligned the analysis and implementation of the CSAPR Update with the 2017 ozone season (May 1 – September 30), the last ozone season wholly occurring before the 2018 attainment date on which states could rely to demonstrate attainment of the 2008 ozone NAAQS.  Idsal Decl. ¶ 58.

[3] Oxides of nitrogen ($NO_X$) are an ozone precursor.  Idsal Decl. ¶ 21.

necessary to promulgate further revised FIPs that would fully address (through additional emission reductions) the upwind states' significant contributions to downwind nonattainment.[4]  EPA did not conclude that sources in these states must necessarily implement further emission reductions. Instead, EPA noted that further analysis at each of the four steps was needed to determine what, if any, additional reductions would be required.  *Id.* at ¶ 67.

C.     **The Close-Out Rule**

Based upon the framework used in the CSAPR Update, EPA next considered the necessity of promulgating further revised FIPs for the 20 upwind states covered by the CSAPR Update with remaining Good Neighbor obligations with respect to the 2008 NAAQS.  Idsal Decl. ¶¶ 69-73.  In December 2018, EPA issued the CSAPR "Close-Out Rule" to address the good neighbor obligations that remained, if any, for these states.  "Determination Regarding Good Neighbor Obligations for the 2008 Ozone National Ambient Air Quality Standard," 83 Fed. Reg. 65,878 (Dec. 21, 2018).[5]

---

[4] As to Tennessee, EPA found the CSAPR Update to be a complete remedy.  EPA subsequently approved Kentucky's SIP.  Idsal Decl. ¶¶ 67 n. 9, 68.  This leaves 20 states with outstanding obligations.

[5] In 2018 two of these Plaintiffs, New York and Connecticut, sued in this Court to force EPA to conduct rulemaking to address any remaining Good Neighbor obligations for five states. Consistent with the Court's Order, EPA finalized the Close-Out Rule by December 6, 2018.  *See New York v. Pruitt*, No. 18- cv-406 (S.D.N.Y), ECF No. 34.

By the time the EPA issued the Close-Out Rule, the 2018 Moderate area attainment date had already passed.  Accordingly, EPA considered whether potential Good Neighbor obligations could be addressed in time for the next downwind attainment dates for the 2008 ozone NAAQS: 2021 (for Serious nonattainment areas) and 2027 (for Severe nonattainment areas).  Idsal Decl. ¶ 70.  Assessing whether potential additional emission reductions could be obtained under the Good Neighbor Provision in time for the 2020 ozone season, in anticipation of the 2021 Serious area attainment date, EPA concluded that they could not.  *Id.* ¶¶ 70-71.[6]

Focusing instead on the year by which new, cost-effective emission controls could be installed, EPA selected the 2023 analytic year.  *Id.* ¶ 72.  However, looking at that year, EPA's modeling at that time showed that all downwind areas in the CSAPR Update region would be in attainment by 2023, when controls would otherwise be imposed.  *Id.* ¶ 73.  The Close-Out Rule thus concluded that the controls imposed under EPA's first rulemaking, the CSAPR Update, had been sufficient to fully resolve upwind Good Neighbor obligations for the 2008 ozone NAAQS.  *Id*.

## II.    The *Wisconsin* and *New York* Litigation

The CSAPR Update was challenged in the United States Court of Appeals for the District of Columbia pursuant to the D.C. Circuit's exclusive jurisdiction over petitions for review of nationally applicable CAA regulations.  *See* 42 U.S.C. § 7607(b)(1).  In *Wisconsin v. Environmental Protection Agency*, 938 F.3d 303 (D.C. Cir. 2019) ("*Wisconsin*"), the D.C. Circuit

---

[6] Consistent with its historical practice, EPA assessed 2020 as the last ozone season wholly occurring before the 2021 attainment date on which states could rely to demonstrate attainment.  Idsal Decl. ¶ 71 n.11.

upheld the CSAPR Update in virtually all respects, but held that the action was deficient to the extent it only required *partial* abatement of upwind states' significant contributions in time for the 2018 attainment date, while downwind states remained under statutory obligation to entirely eliminate nonattainment by that same deadline.  938 F.3d at 312-20.  The Court concluded that "the Good Neighbor Provision calls for elimination of upwind states' significant contributions on par with the relevant downwind attainment deadlines.  The Update Rule fails to do so."  *Id.* at 315.

Significantly, the Court noted that the CSAPR Update's requirement of only partial abatement by the 2018 attainment date was "in large part because the Update Rule confines itself to addressing upwind contributions from EGUs [electric generating units] due to an ostensible lack of information about non-EGUs."  *Id.* at 313.  The Court held that absent a demonstration by EPA of impossibility or uncertainty so profound as to preclude reasoned judgment, EPA must address these sources if necessary to fully resolve upwind states' significant contributions.  *Id.* at 318-19.  Nonetheless, the Court identified flexibilities EPA retains in administering the Good Neighbor Provision, acknowledging EPA's discretion in interpreting the term "significant contribution."  *Id.* at 320.  And the Court noted that EPA can attempt to show "impossibility," or a profound degree of "uncertainty" precluding reasoned judgment.  *Id.*  The Court also recognized that the statutory command that compliance with the Good Neighbor Provision must be achieved consistent with the CAA might be read, upon a sufficient showing of necessity, to allow some deviation from downwind deadlines, so long as it is rooted in the Act's framework and provides a sufficient level of protection to downwind States.  *Id.*

On the question of remedy, the Court noted that vacating the rule might cause disruption and that EPA might ultimately sustain the obligations it had promulgated on remand, and thus the Court remanded without vacatur.  *Id.* at 336.  Finally, the Court stated:

> We decline Environmental Petitioners' request, however, to impose a six-month timeframe on EPA's promulgation of a revised rule. But of course, we do not intend to grant an indefinite stay of the effectiveness of this court's decision. And Environmental Petitioners could attempt to bring a mandamus petition to this court in the event that EPA fails to modify the Rule in a manner consistent with our opinion.

*Id.* at 336-37 (internal quotation marks, citations, and alterations omitted).

Following the *Wisconsin* decision, a different panel of the D.C. Circuit turned to the consolidated challenges to the Close-Out Rule. *New York v. EPA*, 19-1019 (D.C. Cir.). The Court requested supplemental briefing from the parties as to the effect of the *Wisconsin* remand on the pending challenge to the Close-Out Rule, as well as the appropriate remedy and timing for promulgation of any revised rule. Per Curiam Order, 19-1019 Doc. 1806609 (D.C. Cir. Sept. 16, 2019) (Issacharoff Decl. Ex. A).

Petitioners—who include all six Plaintiffs in this case—responded that the *Wisconsin* remand required vacatur of the Close-Out Rule. *See* Supp. Br. of Citizen and State Pet'rs, 19-1019 Doc. 1806995 at 1 (D.C. Cir. Sept. 18, 2019) (Issacharoff Decl. Ex. C). The petitioners went on to ask for the same relief that the *Wisconsin* petitioners had sought and been denied: "Petitioners respectfully request that the Court vacate the Close-Out Rule and remand to EPA with instructions to issue a final replacement rule by March 1, 2020, that fully resolves upwind States' Good Neighbor Provision obligations under the 2008 ozone standard by the start of the 2020 ozone season, on May 1, 2020." *Id.* at 10.

EPA agreed that *Wisconsin* undermined its basis for the Close-Out Rule to the extent the Close-Out Rule did not make the showing required by *Wisconsin* to justify analyzing a year after the next attainment date. But EPA disagreed with the petitioners about the remedy. As EPA explained, the key analytic flaw in the CSAPR Update FIPs that the *Wisconsin* Court had identified was that the FIPs only *partially* addressed the Good Neighbor obligations:

> The Close-Out Rule was promulgated specifically to address any remaining Good Neighbor obligations not addressed in the "partial" CSAPR Update. . . . *If EPA had fully addressed upwind states' significant contributions to downwind nonattainment in the CSAPR Update, as* Wisconsin *suggests was required, there would have been no need to issue the Close-Out Rule. A revision to the CSAPR Update is thus likely to subsume the issues that the Close-Out Rule sought to address and obviate the need for a separate rule.*

Respondent EPA's Supp. Br., 19-1019 Doc. 1806991 at 4 (D.C. Cir. Sept. 17, 2019) (Issacharoff Decl. Ex. B) (emphasis added).

The Court ultimately agreed with the parties that the Close-Out Rule suffered from the same defect as the CSAPR Update: namely, that it used 2023 as the analytic year for elimination of upwind states' significant contributions without a proper showing of necessity given the 2021 attainment date for downwind states. 781 F. App'x at 6-7. However, although it did not discuss the parties' contrasting position on remedy, it implicitly accepted EPA's position that no additional rulemaking would be required once the *Wisconsin* remand was addressed. The Court did not impose the deadline requested by petitioners, instead holding simply that "the rule imposes no obligations, so vacating it will cause no disruption," and accordingly vacated the Close-Out Rule. *Id.* at 7.[7] For the same reason, no additional rulemaking will be required once the *Wisconsin* remand is addressed.

## III. Procedural History

Following the September and October 2019 decisions in *Wisconsin* and *New York*, on December 20, 2019, Plaintiffs submitted a notice of intent to file suit on the basis that EPA failed

---

[7] Although EPA had requested remand instead of *vacatur*, the distinction was immaterial since EPA would address all issues in both *Wisconsin* and *New York* in a rulemaking on the *Wisconsin* remand. *See* Issacharoff Decl. Ex. B at 4.

to promulgate FIPs for the Upwind States and claiming that this was a nondiscretionary duty pursuant to 42 U.S.C. § 7604(a)(2) and (b) (requiring 60 days' notice for suit to enforce nondiscretionary duty and vesting jurisdiction in any United States district court).

On February 7, 2020, several environmental groups filed suit in the District of Columbia seeking essentially the same relief—the promulgation of FIPs for all 20 upwind states subject to the CSAPR Update with outstanding obligations, including the seven Upwind States at issue in this litigation. *See Downwinders at Risk et al. v. Wheeler*, 20 Civ. 349 (TNM) (D.D.C. Feb. 7, 2020) ("*Downwinders*").

On February 19, 2020, Plaintiffs filed the instant Complaint. Dkt. No. 1. Relying on the 60 days' passage between the December 20, 2019 notice and the filing of the Complaint, Plaintiffs assert that EPA is in violation of its statutory deadline to promulgate FIPs for the seven Upwind States. Plaintiffs now move for summary judgment.

## ARGUMENT

### I.    This Court Lacks Jurisdiction over Plaintiffs' Claim

"On a motion invoking sovereign immunity to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of proving by a preponderance of evidence that jurisdiction exists." *Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 84 (2d Cir. 2001). Here, Plaintiffs can only demonstrate a waiver of sovereign immunity conferring jurisdiction on this Court if they can identify a mandatory, non-discretionary duty to act by a specific statutory deadline. Yet EPA has already taken action in the CSAPR Update to discharge its statutory duty to promulgate FIPs for the Upwind States. The *Wisconsin* decision by the D.C. Circuit made clear that the duty was deficiently discharged and remanded for EPA to correct the deficiency, but the D.C. Circuit did not vacate the CSAPR Update. Thus, the duty remains discharged. The vacatur of the Close-Out Rule is immaterial: under the D.C. Circuit's own reasoning, EPA was not

authorized to promulgate only partial FIPs by the next ozone attainment date without the necessary showings of impossibility and/or necessity, and therefore the revision of the CSAPR Update pursuant to the *Wisconsin* decision will subsume the issues previously addressed by the Close-Out Rule.  Accordingly, because no mandatory duty exists, the Court lacks subject matter jurisdiction and the case must be dismissed.

### A.    EPA Fulfilled Its Statutory Obligations to Promulgate FIPs for the 2008 NAAQS

Plaintiffs' claim that this Court has jurisdiction to impose a schedule by which EPA must promulgate FIPs for the Upwind States rests upon the argument that EPA has an outstanding mandatory duty to promulgate further revised FIPs by the 2017 and 2018 deadlines.  Yet this duty no longer exists; EPA discharged it in the CSAPR Update and the Close-Out Rule.  Under the *Wisconsin* court's holding, the subsequent vacatur of the Close-out Rule is immaterial because that vacatur is already subsumed by the holding and remand in *Wisconsin*.  EPA's FIPs under the Update remain in place, and EPA is addressing their deficiency on remand.  Consequently, Plaintiffs cannot state a citizen suit claim under Section 7604(a)(2), and this single-claim suit must be dismissed for lack of subject matter jurisdiction.

The duty identified by Plaintiffs provides in relevant part:

> The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator (A) finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A), or (B) disapproves a State implementation plan submission in whole or in part . . . .

42 U.S.C. § 7410(c)(1).

There is no dispute that EPA previously fulfilled this duty first by promulgating the CSAPR Update in 2016 (which included FIPs for 22 upwind states, including the Upwind States at issue here) and then by promulgating the Close-Out Rule in 2018 (determining that no further FIPs were

required).   In *Environmental Defense Fund, Inc. v. Gorsuch*, 713 F.2d 802 (D.C. Cir. 1983)

("*EDF*"), the D.C. Circuit held that, where the district court had required EPA to promulgate

regulations and the Agency had done so, the Agency had satisfied the Court's order regardless of

subsequent events—even those that might render the promulgated regulations ineffective (in that

case, the Agency's withdrawal of the regulations).  The Court of Appeals explicitly agreed with

the district judge's conclusion "that "the Agency's *promulgation* of the regulations brought this

proceeding to a close."  *Id*. at 812 (emphasis added) (quoting *Illinois v. Gorsuch*, 530 F. Supp.

337, 339 (D.D.C. 1981)).

**B.   The *Wisconsin* Remand Eliminated Any Mandatory Duty to Promulgate Further Revised FIPs**

Plaintiffs contend that the vacatur of the Close-Out Rule re-imposed the same mandatory

statutory duty that they and EPA believed to exist at the time of *New York v. Pruitt*, No. 18-CV-

406 (JGK) (i.e., after the CSAPR Update but prior to the Close-Out Rule): to promulgate FIPs that

"*fully* address the Upwind States' Good Neighbor obligations."  Pl. Br. at 14 (emphasis added).

The status quo that existed in 2018, however, has now been irrevocably altered by the D.C.

Circuit's holding in *Wisconsin*, and no obligation for a second round of FIP promulgation any

longer exists.  Prior to the *Wisconsin* litigation, EPA operated under the legal position that it was

permissible to promulgate a single set of FIPs *partially* addressing upwind states' Good Neighbor

obligations, and then later promulgate further revised FIPs fully addressing those obligations after

the passage of the attainment date, essentially acknowledging that a mandatory FIP duty could

remain outstanding after the initial action.[8]  Yet the *Wisconsin* Court made clear that "the Good

---

[8] Because EPA had, at the time, viewed the CSAPR Update as only a partial rulemaking, EPA
conceded in the *Pruitt* litigation that a mandatory duty existed to promulgate a complete

Neighbor Provision calls for *elimination* of upwind States' significant contributions on par with the relevant downwind attainment deadlines." *Wisconsin*, 938 F.3d at 315 (emphasis added). Therefore, EPA was obligated to fully address its duty under the Good Neighbor Provision in one action, the CSAPR Update, rather than multiple actions extending beyond the applicable attainment date. For this reason, the *Wisconsin* Court remanded for EPA to revise the FIPs promulgated pursuant to the CSAPR Update to fully address upwind states' Good Neighbor obligations. At this point, then, there is an acknowledged *substantive* deficiency in the CSAPR Update FIPs that EPA must reasonably address on remand; but there is no *outstanding failure to act on a mandatory statutory duty*.

As EPA noted to the *New York* Court, the *Wisconsin* instruction on remand meant that the concept of the second round of revised FIPs was now a nullity:

> The Close-Out Rule was promulgated specifically to address any remaining Good Neighbor obligations not addressed in the "partial" CSAPR Update. . . . If EPA had fully addressed upwind states' significant contributions to downwind nonattainment in the CSAPR Update, as *Wisconsin* suggests was required, there would have been no need to issue the Close-Out Rule. A revision to the CSAPR Update is thus likely to subsume the issues that the Close-Out Rule sought to address and obviate the need for a separate rule.

Issacharoff Decl. Ex. B at 4. And that revision to the CSAPR Update, subsuming any issues relating to the Close-Out Rule, is precisely what EPA intends to do, albeit in a two-staged rulemaking compliant with CAA requirements as articulated by the *Wisconsin* Court. *See* Idsal Decl. ¶¶ 10, 100 (explaining EPA's approach as complying with *Wisconsin* and noting steps required before "EPA can impose FIPs to fully address the Upwind States' remaining good neighbor obligations").

---

rulemaking fully addressing the CAA Good Neighbor obligations. *See New York v. Pruitt*, No. 18-CV-406 (JGK), 2018 WL 2976018, at *3 (S.D.N.Y. June 12, 2018). In light of the *Wisconsin* decision, EPA's concession in the Pruitt litigation proved to be incorrect as a legal matter.

Contrary to Plaintiffs' position therefore, the status quo is not one set of partial FIPs and an outstanding obligation to promulgate *additional* FIPs.  Rather, it is one single set of FIPs, which remain in place but have been found legally deficient, and which must be revised in accordance with the D.C. Circuit's remand in the *Wisconsin* litigation.  Plaintiffs can therefore identify no mandatory duty that exists to promulgate additional FIPs by a statutory deadline.

### C.     Absent a Mandatory Duty, This Court Lacks Jurisdiction over Plaintiffs' Claim

Plaintiffs' inability to identify such a mandatory duty that must be fulfilled by a date-certain statutory deadline deprives this Court of jurisdiction, because neither the APA nor the CAA's waiver of sovereign immunity extends to a suit over unreasonable delay in this Court.  *See Sierra Club v. Wheeler*, 956 F.3d 612, 617-18 (D.C. Cir. 2020) (duty to act by a date-certain deadline must be clear and unambiguous to be enforceable as a "mandatory duty" under the CAA).  "Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute . . . ."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  And Congress "may define the terms and conditions of" any waiver of the United States' sovereign immunity and "the terms of [the] consent to be sued in any court define that court's jurisdiction to entertain the suit."  *Lipkin v. S.E.C.*, 468 F. Supp. 2d 614, 621 (S.D.N.Y. 2006) (quoting *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)).  As Plaintiffs must concede, this Court's jurisdiction to compel EPA to act extends only to circumstances "where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator."  42 U.S.C. § 7604(a)(2).  *See Valero Energy Corp. v. EPA*, 927 F.3d 532, 535 (D.C. Cir. 2019) (noting date certain requirement for mandatory duty suit under the CAA); *Sierra Club v. Jackson*, 724 F. Supp. 2d 33, 39 (D.D.C. 2010) (same).  Those circumstances are not present here and, tellingly, the D.C. Circuit expressly declined to set a deadline by which EPA

must act on remand.  Accordingly, because EPA is no longer subject to a non-discretionary duty to promulgate additional FIPs implementing the 2008 ozone NAAQS by a statutory deadline, no jurisdiction exists in this Court.

Plaintiffs are not without potential remedy elsewhere.  As the D.C. Circuit has explicitly provided, Plaintiffs can seek mandamus to compel EPA to act within a certain time frame if the agency unreasonably delays its efforts to address the remand.  *Wisconsin*, 938 F.3d at 337.  Although absent "substantial justification" courts may not dictate remand's "time dimension," *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 544-45 (1978), such actions remain available, particularly to enforce court orders, *see, e.g.*, *Pub. Citizen Health Research Grp. v. Brock*, 823 F.2d 626 (D.C. Cir. 1987) (setting deadline after agency failed to act for years despite earlier court-ordered deadline); *Envtl. Def. Fund v. EPA*, 852 F.2d 1316, 1331 (D.C. Cir. 1988) (same).

Additionally, an unreasonable delay claim under CAA Section 7604(a) also may be available in the District Court for the District of Columbia, subject to Plaintiffs' meeting the statutory requirements:

> an action to compel agency action referred to in section 7607(b) of this title which is unreasonably delayed may only be filed in a United States District Court within the circuit in which such action would be reviewable under section 7607(b) of this title.  In any such action for unreasonable delay, notice to the entities referred to in subsection (b)(1)(A) shall be provided 180 days before commencing such action.

42 U.S.C. § 7604(a); *see also id.* § 7607(b) (covering, *inter alia*, implementation plans under § 7610).  But in the case before *this* Court, Plaintiffs clearly have not met the statutory requirements for an unreasonable delay claim here, for two reasons.  First, Plaintiffs filed suit on February 19, 2020—at least 60 days after filing their notice as would have been required for a mandatory duty claim under 42 U.S.C. § 7604(b)(2), but less than the 180 days required to have elapsed before *commencing* an action under § 7604(a).  *See Envtl. Integrity Project v. U.S. Envtl.*

*Prot. Agency*, 160 F. Supp. 3d 50, 52 (D.D.C. 2015) (concluding that 180-day notice provision is jurisdictional).

Second, even if *a* district court might have jurisdiction over Plaintiffs' complaint, the Southern District of New York would not be the appropriate venue.   42 U.S.C. § 7604(a) states that an action to compel action unreasonably delayed under Section 7607(b) may only be filed in a district court within the circuit in which such action would be reviewable under Section 7607(b). Section 7607(b), meanwhile, states that federal or state implementation plans that are nationally applicable, or which EPA determines to be of "nationwide scope or effect," can only be reviewed in the D.C. Circuit.   Because the EPA intends a regional rulemaking potentially affecting 20 upwind states, Idsal Decl. ¶¶ 95-99, EPA's rulemaking in this instance would almost certainly be nationally applicable or determined to be of nationwide scope or effect.  The same was true for the CSAPR Update, the Close-Out Rule, the original 2011 CSAPR, the 2005 CAIR, and the 1997 NO$_X$ SIP Call.  *See* 81 Fed. Reg. at 74,586 (CSAPR Update "'nationally applicable' and of 'nationwide scope and effect' within the meaning of section 307(b)(1)'"); 83 Fed. Reg. at 65,923 (same for Close-Out Rule); Idsal Dec. ¶¶ 31, 36, 45, 74, 78, 95-99.

Plaintiffs' additional proffered bases for jurisdiction, Compl. ¶ 10, fare no better.  First, Plaintiffs cite 28 U.S.C. § 1331, the general federal question jurisdiction statute.  However, it is well established "that the general federal question jurisdictional statute, 28 U.S.C. § 1331, does not constitute a waiver of sovereign immunity by the United States."  *Mack v. United States*, 814 F.2d 120, 122 (2d Cir. 1987).  *See also Doe v. Civiletti*, 635 F.2d 88, 94 (2d Cir.1980) ("Section 1331 is in no way a general waiver of sovereign immunity.  Such a waiver, if it exists at all, must be sought in the statute giving rise to the cause of action.").  Second, Plaintiffs cite the federal mandamus statute, 28 U.S.C. § 1361, as providing an independent basis for jurisdiction.  But no

mandamus remedy exists where unless, among other things "'no other adequate means [exist] to attain the relief [the plaintiff] desires" *Burns v. Dep't of Health & Human Servs.*, No. 1:19-CV-2246 (CM), 2019 WL 4933452, at *1 (S.D.N.Y. Oct. 4, 2019) (alterations in original) (quoting *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010)).  Here, the otherwise available remedies—a CAA mandatory duty claim in district court  where an unperformed mandatory exists; a CAA unreasonable delay claim, after 180 days' notice, in a district court in the circuit where final action would be reviewed; and the power of the D.C. Circuit to enforce its own judgments—preclude broader mandamus jurisdiction over the same issues.  *See Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, No. 1:18-CV-02035 (TNM), 2020 WL 1065406, at *24 (D.D.C. Mar. 5, 2020) ("[Plaintiff's] request for a writ of mandamus under § 1361 is, at a minimum, redundant.").

Accordingly, because (1) no mandatory non-discretionary duty exists to promulgate new FIPS, (2) a mandamus petition can only be brought in the D.C. Circuit, and (3) jurisdiction over an unreasonable delay suit is lacking, this Court lacks jurisdiction to decide Plaintiffs' claim.

## II.    Plaintiffs' Proposed Schedule Is Unreasonable

Even if the Court were to conclude that it in fact has jurisdiction, it still should not adopt Plaintiffs' proposed schedule.  As it has consistently maintained since the *Wisconsin* remand, EPA intends to undertake a comprehensive rulemaking to remedy the defects identified by the *Wisconsin* Court, which will necessarily resolve any outstanding obligations that had previously been addressed by the Close-Out Rule.  The Court should therefore follow the path of the D.C. Circuit and decline to set a strict rulemaking schedule that will leave EPA insufficient time and flexibility to craft a comprehensive and legally defensible approach to resolving the remaining obligations of the 20 CSAPR Update states.

### A.      Legal Standard

Where EPA cannot meet a mandatory deadline, courts often adopt remedial schedules proposed by EPA.  *See, e.g.*, *Sierra Club v. Pruitt*, 238 F. Supp. 3d 87, 89 (D.D.C. 2017) (finding EPA's declaration "sufficiently detailed to support [EPA's] proposed deadline"); *Envtl. Def. Fund v. Thomas*, 627 F. Supp. 566, 569-70 (D.D.C. 1986) (finding that EPA's proposed schedule was "reasonable").  Courts adjudicating whether a schedule for agency action is impossible must grapple with the facts and make findings that compliance is in fact possible.  *See Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 166 (D.C. Cir. 2017) (holding district court's failure to assess agency's claims of impossibility an abuse of discretion).

Even when courts decline to adopt an agency's proposed timeline, they acknowledge that a court-ordered deadline should "afford sufficient time for [the agency] to shift resources," *Sierra Club v. Johnson*, 444 F. Supp. 2d 46, 58 (D.D.C. 2006), and consider the amount of time "necessary for the promulgation of workable regulations," *Sierra Club v. Thomas*, 658 F. Supp. 165, 175 (N.D. Cal. 1987).  *See also Maryland v. Pruitt*, 320 F. Supp. 3d at 732 n.8 (acknowledging EPA's disregard of its statutory obligations, but concluding that the court's role was not "to punish them for their past dilatory conduct," and instead "must determine, from this point forward, a pragmatic, reasonable schedule for Defendants to comply with their mandatory statutory duty").  There is a public interest in "ensuring that the government does not [act] via a process that emphasizes expediency over quality and accuracy."  *Cronin v. Browner*, 90 F. Supp. 2d 364, 373 (S.D.N.Y. 2000); *see also Sierra Club v. Thomas*, 828 F.2d 783, 798 (D.C. Cir. 1987) ("EPA must be afforded the amount of time necessary to analyze such questions so that it can reach considered results in a final rulemaking that will not be arbitrary and capricious or an abuse of discretion.").  That is particularly true in the context of the CAA's Good Neighbor obligations, which are highly

complex rulemakings often subjected to extensive litigation.  *See* Idsal Decl. ¶¶ 31, 36, 45-49, 74-79.

The role of the reviewing court in addressing the failure of an agency to meet a statutory deadline is to examine the relevant information and evaluate the time necessary for the agency to take a reasoned, responsible, and effective action that will achieve the results intended by Congress.  Here, as explained in more detail below, EPA proposes a bifurcated rulemaking approach, with a deadlines of March 15, 2021, for initial action to obtain any needed and available emission reductions by the 2021 attainment date, and a deadline of March 15, 2022, for a subsequent rulemaking (or, if a supplemental proposal is needed, December 15, 2022) for a second rulemaking to completely resolve the remaining obligations.  The latter rulemaking, in compliance with the *Wisconsin* decision, is pursuant to a showing that this is the necessary amount of time to promulgate a complete remedy in a technically and legally defensible way.  *Id.* ¶¶ 8-16.

### B.      Plaintiffs' Proposed Schedule Is Unfeasible

Plaintiffs proposed schedule—a proposed rule implementing a complete remedy in less than four months (October 1, 2020), followed by a final rule for a complete remedy by March 1, 2021—does not afford EPA sufficient time to conduct a reasoned rulemaking that undertakes the complex data analysis required to comply fully with the *Wisconsin* remand and EPA's statutory obligations.  Idsal Decl. ¶ 175.

Ultimately, while EPA agrees that work toward a partial rule, accelerated at all possible speed, can be finalized prior to the 2021 ozone season, the complete rulemaking sought by Plaintiffs and mandated by the *Wisconsin* Court cannot be accomplished within that timeframe. Idsal Decl. ¶ 175 ("[A] complete remedy will require much more comprehensive assessment of longer-term controls at both EGU and non-EGU sources across a large geographic region, and may necessitate updated air quality modeling for one or more future analytic years after 2021.  That

kind of major rule is impossible for the Agency to issue within the timeframe Plaintiffs seek."). Looking to the timeframes required for prior regional Good Neighbor rulemakings, typically a three-year timeframe has been needed, *id.* ¶¶ 84-87; running from the time of the D.C. Circuit's decision in *Wisconsin*, that translates into a deadline for final action in the fall of 2022, as EPA requests, *id.* ¶ 179.

Critically, as explained in more detail in the following section, EPA cannot comprehensively address non-EGU emissions sources as needed for a complete remedy to significant contribution on a one-year rulemaking timeframe. Plaintiffs' generic citations to EPA's work on certain non-EGU sources under other CAA programs, *see* Babbidge Decl. para. 27., do not answer the question of whether the analytic gaps and issues EPA anticipates here can be resolved in a 10-month timeframe. *See generally* Idsal Decl. ¶¶ 126-50. Those rulemakings addressed sector-specific emission-control requirements, and not necessarily for the relevant pollutant here, *id.* ¶¶ 132, 138, 176, whereas the broad *Wisconsin* remand would require EPA to gather emissions data from across multiple sectors, with vastly differing levels of existing control both within and across sectors and varying regimes for emissions monitoring, and convert these inputs to a common dataset that could be used for broad, comprehensive analysis in a carefully calibrated, regional-scale rulemaking, *id.* ¶¶ 130-36.

Plaintiffs' assertion to the contrary rests upon supposition and analogy to inapposite prior efforts. First, contrary to Plaintiffs' suggestions, *e.g.* Babbidge Decl. ¶ 27, the schedule for the Close-Out Rule endorsed by this Court in *Pruitt* does not offer meaningful guidance for a rulemaking of this scope. The Close-Out Rule was able to be promulgated less than a year from this Court's order in *Pruitt* because, based on air quality modeling work that had already been completed, and EPA's understanding at the time regarding the appropriateness of the analytic year

it had modeled, EPA believed that the remaining Good Neighbor obligations could lawfully be found complete without substantial new technical analysis or the imposition of further emissions controls.  Idsal Decl. ¶¶ 89, 177.  Thus, the rulemaking process that needed to be conducted was relatively uncomplicated in comparison with prior regional Good Neighbor rules involving imposition of emission-control requirements, as well as in comparison to the rulemaking process EPA anticipates will be required in this case.  *Id.*  Additionally, Plaintiffs' claim that EPA has been idle since the *Wisconsin* and *New York* mandates issued is incorrect.  *Id*. ¶¶ 90-94.  In particular, EPA began working to update air quality modeling and analyses necessary to take action in time for the 2021 attainment date following the decision in *Wisconsin* and has now begun to obtain and analyze preliminary results.  *Id.* ¶ 92.  EPA staff have made progress on the development of a policy framework to act on remand, and the Agency in a position to propose a short-term remedy addressing measures needed and implementable by the 2021 ozone season by October 1, 2020, and to take final action on that remedy by March 15, 2021.  *Id.* ¶¶ 11-13.   But EPA is in no position to promulgate a complete remedy on that timeframe.  *Id.* ¶¶ 179-83.

    **C.**      **EPA's Proposed Schedule**

        **1.**      **Technical Requirements**

    Having analyzed its obligations under *Wisconsin* and *New York*, EPA intends to conduct a regional rulemaking utilizing the same four-step framework as in the CSAPR and CSAPR Update, which reflects prior experience with interstate transport rulemaking and has been endorsed by the courts.  Those four steps consist of:

> (1) identifying downwind receptors that are expected to have problems attaining or maintaining clean air standards (i.e., NAAQS); (2) determining which upwind states contribute to these identified problems in amounts sufficient to "link" them to the downwind air quality problems; (3) for states linked to downwind air quality problems, identifying upwind emissions that significantly contribute to nonattainment or interfere with maintenance of a standard; and (4) for states that are found to have emissions that significantly contribute to nonattainment or

> interfere with maintenance of the NAAQS downwind, implementing reductions
> through enforceable measures . . . .

Idsal Decl. ¶ 38.  Deploying this process for a complete remedy analysis for both the EGU and

non-EGU controls required here will require a lengthy process of technical analytical work,

stakeholder feedback, and further refinement, particularly at Step 3 of this analysis.  *See id.* ¶ 102.

### a.    Steps One and Two

As to the first two steps, EPA acknowledges that is has recently completed new modeling

allowing it to project air quality conditions in 2021 and other potentially relevant future years.  *Id.*

¶¶ 103-06, 110.  Likewise, at the second step, EPA has modeling to inform which upwind states

contribute to future nonattainment or interfere with maintenance at downwind receptors in the

relevant year(s).  *Id.* ¶¶ 107, 109, 111.

### b.    Step Three

At Step 3, EPA must evaluate the level of emissions reductions available from control

strategies that can be implemented in a future year or years (here, 2021 and/or a later year on a

showing of impossibility by 2021) and the impacts on air quality from implementation of those

emission reductions.  *Id.* ¶ 112.[9]  In order to implement a complete remedy under the *Wisconsin*

---

[9] As explained in the Idsal Declaration, in this respect, EPA's proposed schedule is compliant with

the D.C. Circuit's holding in *Wisconsin*.  First, as the court directed in that case, EPA can make a

showing of impossibility as to a complete-remedy rulemaking by next March.  EPA makes the

necessary showing of impossibility in the Idsal Declaration, ¶¶ 175-84, responding in detail to

Plaintiffs' asserted basis for their requested rulemaking schedule.  This comports with the

*Wisconsin* holding that implementing Good Neighbor obligations beyond the dates established for

Court's holdings, EPA must evaluate all available emissions reductions from both EGUs and non-EGUs and calculate appropriate emissions limitations for sources in the Upwind States to ensure emissions reductions are achieved. *Id.* Therefore, while EPA may be able to conduct a partial rulemaking to address some potentially available, near-term emission-reduction obligations (likely limited to EGUs) in time for the 2021 Serious attainment date, a complete-remedy rulemaking would be, in EPA's view, impossible to complete in the next 10 months. *Id.* ¶ 175.

A subsequent, two-year rulemaking is necessary in order for EPA to be able to assess fully the longer-term emission reductions available from both EGU and non-EGU sources and determine whether such reductions are warranted to address good neighbor obligations in a future analytic year. *Id.*; *see generally id.* ¶¶ 112-21, 151-55 (describing the work required for a complete Step 3 analysis); *id.* ¶¶ 122-25 (steps required to evaluate further EGU control strategies); *id.* ¶¶ 126-50 (analytic problems to address and steps required to evaluate non-EGU control strategies).

In particular, the current quality of information EPA possesses as to the large universe of non-EGU emission sources is likely insufficient to complete a defensible rulemaking for such sources by March 1, 2021. For many of these sources, EPA has identified substantial data gaps as

--------

attainment may be justified on a proper showing of impossibility. 938 F.3d at 320. Second, EPA's rulemaking schedule presents a clear plan for expeditiously fully resolving the remaining obligations. The *Wisconsin* court noted that EPA had no expressed plan for resolving the obligations it was leaving unaddressed. *Id.* at 314. Here, by contrast, EPA has made clear its plan for fully resolving remaining obligations as quickly as possible, as reflected in the schedule for Rulemaking #2. *See* Idsal Declaration ¶ 10.

to current emissions, what existing controls are already installed, and the availability, cost, and efficacy of additional controls. *Id.* ¶¶ 129-38. All of these components are critical to a defensible Step 3 analysis. EPA anticipates that in order to meet the procedural requirements for rulemaking, including adequate public notice and opportunity to comment, a supplemental proposal will likely be needed before taking final action imposing any necessary emission-control requirements on non-EGU sources. *Id.* ¶¶ 146-47. Further, because a longer-term control strategy for non-EGUs is interrelated to that for EGUs (in terms of timeframes for analysis, control cost thresholds, and air quality impacts), *id.* ¶ 125, a rulemaking comprehensively assessing longer-term controls must be available as to all sources on a single timeframe—i.e., by March 15, 2022, or if a supplemental proposal is needed for non-EGUs, then, for both EGUs and non-EGUs, by December 2022.

### c.    Step Four

Finally, at Step 4, EPA must implement the selected level of emission reductions through an enforceable set of requirements, including in addition to any emission limits, ancillary requirements for monitoring, recordkeeping, and reporting. While this process is fairly well-established for the EGU controls previously implemented under prior rulemakings, the strategies employed there may not be applicable for non-EGU controls, necessitating several additional months of technical work during the rulemaking process to develop appropriate implementation strategies and associated requirements for these sources. *See id.* ¶ 158.

In short, EPA can complete a narrow, short-term analysis as to a limited set of sources in time for a final rule by March 15, 2021. By contrast, in addition to the other required steps in the rulemaking process outlined in the section below, for a complete remedy, EPA anticipates needing at least 8 months to develop the technical basis for a proposal (June 21, 2021), and that work would only begin in earnest once EPA has signed its Rulemaking #1 proposal by October 2, 2020, *see id.* ¶ 14. After the close of a comment period in September of 2021, EPA would need 5 months to

develop the technical analysis (including response to comments) for a final rule by March 15, 2022.  *Id.*  Alternatively, EPA would need five months for the technical work to develop a supplemental proposal by March 15, 2022, should EPA determine based on public comment that an updated proposal is warranted.  *Id.* ¶¶ 14, 125, 148, 149.  If EPA issues a supplemental proposal, it would again need an additional 5 months after the close of that comment period to complete the technical work for a final rule.  *Id.* ¶ 148; *see generally id.* Attachment 1 (charts showing EPA's proposed rulemaking schedule).

### 2.    Procedural Requirements for Rulemaking

In addition to the considerable technical work EPA must undertake, it must also carefully proceed through various administrative procedures that are required by statute, executive order, and internal agency directive.  For both rulemakings, EPA must, in addition to the complex technical analysis required to develop the proposed rule described above:

- Develop proposed technical analysis, preamble, regulatory text, and Regulatory Impact Analysis (RIA);

- Allow for agency review of the draft proposed rule and supporting materials;

- Allow for interagency review of the draft proposed rule;

- Sign the proposed rule;

- Publish the proposed rule;

- Allow a notice-and-comment period on the proposed rule of at least 45 days;

- Review and respond to comments, develop final technical analysis, preamble, regulatory text, and RIA

- Allow for agency review of the draft final rule and supporting materials;

- All for interagency review of the draft final rule; and

- Sign and publish the final rule.

*See* Idsal Decl. ¶ 159 (table); *see also id.* ¶¶ 160-174 (explaining the requirements at each of these steps under applicable statutes, regulations, executive orders, and agency procedures); *id.* Attachment 1 (charts for two rulemakings plus supplemental proposal).  In addition, senior management would need to be briefed throughout.  *See id.*

### 3.  Proposed Schedule

EPA has worked diligently to determine how the various technical and administrative steps can be streamlined in a manner that (1) allows all possible control measures to be implemented by the 2021 ozone season and (2) allows the timely implementation of the full suite of EGU and non-EGU emissions controls required by the *Wisconsin* decision.

EPA accordingly anticipates that the most expeditious schedule by which the Administrator can take action fully addressing the remaining interstate transport requirements of the Good Neighbor Provision for the 2008 ozone NAAQS for the Upwind States is to conduct a bifurcated rulemaking, wherein for the initial rule, the Administrator would sign a notice of proposed action by November 15, 2020, and sign a notice of final action by March 15, 2021; and, for the second rule, the Administrator would sign a notice of proposed action by June 21, 2021, and sign a notice of final action by March 15, 2022, *unless* EPA signs a supplemental notice of proposed rulemaking by March 15, 2022, in which case, EPA would sign a notice of final action by December 15, 2022. *Id*. ¶ 186.  The phases of rulemaking required to implement these schedules are laid out in Attachment 1 to the Idsal Declaration.

### CONCLUSION

For the reasons set forth herein, the Government respectfully asks that the Court dismiss the Complaint for lack of subject-matter jurisdiction.  In the alternative, if the Court determines it has jurisdiction, the Government respectfully asks that the Court grant EPA's cross-motion for summary judgment and adopt the Government's proposed rulemaking schedule.

Dated: June 5, 2020
       New York, New York

                                        Respectfully Submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney of the
                                        Southern District of New York

                                 By:    /s/ *Lucas Issacharoff*
                                        LUCAS ESTLUND ISSACHAROFF
                                        Assistant United States Attorney
                                        86 Chambers Street, Third Floor
                                        New York, New York 10007
                                        Tel.: (212) 637-3274/2737
                                        Fax: (212) 637-2702
                                        E-mail: lucas.issacharoff@usdoj.gov


### CERTIFICATION OF COMPLIANCE

I hereby certify pursuant to Section II.D of the Court's Individual Rules of Practice that this brief, excluding the caption, table of contents, table of authorities, signature, and this certification, contains 8,951 words.

                                 By:    /s/ *Lucas Issacharoff*
                                        LUCAS ESTLUND ISSACHAROFF
                                        Assistant United States Attorney