UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW JERSEY, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF NEW YORK, COMMONWEALTH OF MASSACHUSETTS, and CITY OF NEW YORK,<br><br>*Plaintiffs*,<br>v.<br><br>ANDREW R. WHEELER, *Administrator of the United States Environmental Protection Agency;* and the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>*Defendants*. | Case No.: 1:20-cv-01425-JGK<br><br>**REPLY DECLARATION OF MICHAEL SHEEHAN IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |

I, Michael Sheehan, declare as follows:

1. I am the Director of the Bureau of Air Quality Planning in the Division of Air Resources of the New York State Department of Environmental Conservation (DEC), where I oversee all aspects of air quality planning for the State of New York. My background and qualifications are fully set forth in my prior declaration dated May 15, 2020 and submitted in this matter in support of plaintiffs' motion for summary judgment. *See* Doc. 33-5 (Sheehan May 15, 2020 Decl.).

2. I am familiar with the facts and circumstances of this matter, which seeks to compel defendants Administrator Andrew Wheeler and the United States Environmental Protection Agency (collectively, EPA), to promulgate federal implementation plans (Federal Plans or FIPs) for Illinois, Indiana, Michigan, Ohio,

Pennsylvania, Virginia and West Virginia (the Upwind States) that fully address their outstanding obligations under the "Good Neighbor Provision" of the federal Clean Air Act (Act) to prohibit interstate transport of air pollution that significantly contributes to nonattainment or interferes with maintenance of the 2008 ozone national ambient air quality standards (2008 ozone NAAQS) in New Jersey, Connecticut, Delaware, New York, Massachusetts, and the City of New York (Plaintiff States).

3. I submit this declaration in response to EPA's opposition and cross-motion papers filed June 5, 2020, including EPA's Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment, Doc. 36-1 (EPA Opp.) and the Declaration of Anne Idsal and accompanying attachment, Docs. 36-3 and 36-4 (Idsal Decl.), and in further support of plaintiffs' motion for summary judgment.

4. EPA concedes it has an obligation to promulgate FIPs fully addressing the Upwind States' significant contributions to downwind nonattainment, *see, e.g.*, Idsal Decl. ¶¶ 5, 68, 79, 99, but disregards the maximum time period provided by the Clean Air Act for doing so. *See* 42 U.S.C. § 7410(c)(1). Under the statute, "[t]he Administrator *shall* promulgate a Federal implementation plan at any time within 2 years after the Administrator--(A) finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A), or (B)

disapproves a State implementation plan submission in whole or in part." *Id.* (emphasis added).

5. EPA primarily asserts that its proposed rulemaking schedule is "expeditious," Idsal Decl. ¶ 6, despite proposing to take up to three years from the vacatur of the CSAPR Close-Out in *New York v. EPA*, 781 F. App'x 4 (D.C. Cir. 2019), in October 2019, more than a year longer than the maximum two-year period provided under the Clean Air Act for EPA's long-overdue FIP obligations. 42 U.S.C. § 7410(c)(1).

6. EPA's concession that it has routinely taken longer than permitted by statute to promulgate interstate transport rules for successive ozone standards, Idsal Decl. ¶¶ 84-87, 179, demonstrates the particular need here for a court-ordered deadline that is within the statutory timeframe—not the unlawfully prolonged schedule EPA has proposed.

7. Plaintiffs have proposed a reasonable, feasible schedule for a single comprehensive rulemaking that fully resolves all remaining good neighbor obligations of the Upwind States for the 2008 ozone NAAQS by the 2021 ozone season. EPA should be required to issue proposed FIPs fully addressing the Upwind States' respective significant contributions to interstate transport for the 2008 ozone NAAQS by October 1, 2020 and promulgate final FIPs no later than March 1, 2021. *See* Sheehan May 15, 2020 Decl. ¶¶ 59-61.

8. EPA also claims that plaintiffs' schedule is not "feasible," Idsal Decl. ¶ 6. But EPA fails to adequately demonstrate in the Idsal Declaration that plaintiffs'

3

proposed schedule is *impossible*. Rather, plaintiffs' schedule is reasonable and congruent with the statutory timeframe, providing approximately 17 months from the vacatur of the CSAPR Close-Out in *New York v. EPA* to a final rule.

9. In contrast, EPA proposes a two-part rulemaking, with the first rulemaking addressing emissions reductions achievable in the short-term from electric generating unit (EGU) sources (Rulemaking #1), and the second rulemaking (Rulemaking #2) addressing non-EGU sources, such as cement kilns, oil and gas refining facilities, and steel mills, and potentially longer-term reductions from EGUs. Idsal Decl. ¶¶ 8, 187.

10. Given the impending attainment deadlines, and the long-overdue nature of EPA's FIP obligations, EPA's proposed two-part rulemaking is unlawful and adds unnecessary complexity and time to an already delayed process.

11. The Idsal Declaration does not demonstrate the impossibility of a comprehensive rulemaking addressing all upwind states and sources together, as plaintiffs have demonstrated is feasible and necessary.

12. EPA admits that it has already completed air quality modeling. *See* Idsal Decl. ¶¶ 92, 110. Therefore, the additional analytical steps to develop a single, comprehensive rule should be well underway, and it is feasible to complete this rulemaking on the timeline plaintiffs propose.

13. With respect to non-EGU sources, EPA points to alleged data gaps, *see, e.g.*, Idsal Decl. ¶¶ 126-136, but does not demonstrate that these data gaps render plaintiffs' proposed rulemaking schedule impossible.

4

14. EPA overstates the scale and quality of the data it claims is necessary and missing. As I described in my prior declaration, Sheehan May 15, 2020 Decl. ¶ 70, EPA need not gather information on all potential upwind non-EGU sources, but should focus on the largest stationary non-EGU sources, such as cement kilns, oil and gas refining facilities, and steel mills, all of which have substantial emissions as well as existing monitoring and reporting obligations and equipment under applicable operating permits.

15. In addition, the periodic National Emissions Inventory requires states to submit data on their large sources every three years and their largest sources annually. For example, for the 2017 National Emissions Inventory (NEI), New York submitted data for 365 sources with Clean Air Act title V operating permits. Of these sources, 96 were EGUs and 269 were non-EGUs. New York annually submits data for its "Type A" sources of nitrogen oxides (NOx), which are those sources with the potential to emit at least 2,500 tons of NOx per year. New York's most recent submission included data for 13 Type A NOx sources: 12 EGUs and 1 non-EGU.

16. EPA should focus on the highest-emitting NOx sources in the Upwind States, and the NEI provides a reasonable starting point for this analysis.

17. EPA concedes that for the 2017 NEI it received data for approximately 81,000 non-EGU sources, including information on emissions control equipment for 17,000 sources. Idsal Decl. ¶ 135.

18. In addition, EPA maintains a Reasonably Available Control Technology/Best Available Control Technology/Lowest Achievable Emissions

5

Reductions database with over 7,500 determinations that can help identify appropriate technologies to mitigate pollution, which could also inform its rulemaking. *See* EPA, RACT/BACT/LAER Clearinghouse (RBLC) Basic Information, https://www.epa.gov/catc/ractbactlaer-clearinghouse-rblc-basic-information (last visited June 17, 2020).

19. To the extent EPA needs to collect additional data on non-EGUs, the agency should have been working on this task for at least the past 4 years. EPA itself identified the need for such data in the 2016 CSAPR Update and affirmatively stated that it intended to continue to obtain the necessary non-EGU data. *See* 81 Fed. Reg. 74,504, 74,522 (Oct. 26, 2016) ("The EPA intends to continue to collect information and undertake analyses for potential future emission reductions at non-EGUs that may be necessary to fully quantify states' interstate transport obligations in a future action.").

20. The need for EPA to collect non-EGU data is not an issue that arose with the decisions in the fall of 2019 in *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019), and *New York v. EPA*; nor were these decisions the first time EPA was put on notice of its outstanding FIP obligations. *Contra* Idsal Decl. ¶ 180. Both New York and Connecticut put EPA on notice of its FIP obligations with notice letters in 2017, and subsequently commenced deadline enforcement litigation in this Court, culminating in this Court's prior order declaring, among other things, EPA's failure to undertake its mandatory duty to promulgate FIPs for many of the Upwind States. *See New York v. Pruitt*, No. 18-cv-406, 2018 WL 2976018, at *4 (S.D.N.Y. Jun. 12, 2018).

6

21.     In any event, EPA has now had nearly nine months since the Court's October 1, 2019 vacatur of the CSAPR Close-Out in *New York v. EPA* during which it has indisputably again been on notice of outstanding FIP obligations under the 2008 ozone NAAQS, *see* Idsal Decl. ¶ 179, and should have been actively gathering information it claims to need.

22.     Even if EPA has taken no steps to collect non-EGU data since October 2019 (or indeed since June 2016 when it issued the CSAPR Update), it need not wait until after completing an EGU-focused rule in March 2021 to even begin data collection, *contra* Idsal Decl. ¶ 81, and then possibly undertake another supplemental round of rulemaking over another year in 2022.

23.     Instead, EPA—without waiting for a court order—could issue an Advance Notice of Proposed Rulemaking to collect non-EGU data now with the goal of obtaining necessary data as expeditiously as practicable and in time for a proposed rulemaking in the fall of 2020. This is a reasonable, substantially more expeditious approach than waiting another year until almost the 2021 attainment deadline to even *propose* a rule for non-EGUs, which EPA expects will prompt submission of long-awaited data, and then possibly extending that rulemaking another nine months for a supplemental proposal in 2022. An Advance Notice would directly address EPA's concern that two rounds of public comment on the non-EGU portion of a comprehensive rulemaking may be needed for a "technically and legally defensible final action." *See* Idsal Decl. ¶ 180.

24. If updating control cost information for the relatively more diverse set of sources found in the non-EGU sectors will entail a "very substantial effort," as EPA anticipates, Idsal Decl. ¶ 142, it is critical that this effort begin as soon as possible, and not wait until another attainment deadline passes in 2021, as EPA has proposed.

25. EPA is incorrect to assert, *see* Idsal Decl. ¶ 9, that its proposed Rulemaking #1 will provide relief from upwind interstate ozone transport by the 2021 serious attainment deadline for downwind States such as New York. Attainment by the 2021 attainment deadline will be based on ozone measured during the 2018, 2019 and 2020 ozone seasons. Since the 2020 ozone season is presently underway, plaintiffs seek a complete remedy by 2021 because of the Clean Air Act's command to ensure attainment as expeditiously as practicable. Indeed, EPA acknowledges that 2020 is the last full ozone season in which air quality monitoring will be used to determine attainment by the 2021 attainment deadline. *See* Idsal Decl. ¶ 71 n.11.

26. With respect to the various rulemaking steps EPA proposes, a bifurcated rulemaking adds significant redundancy to the rulemaking timeline and unnecessarily lengthens the schedule. EPA concedes that it has allotted up to 10 months for agency internal review, two months at each draft and final rule stages for Rulemaking #1, Rulemaking #2, and another two months for the supplemental proposal. *See* Idsal Decl. ¶¶ 159, 164, 171-172, Attachment 1.

27. Similarly, EPA has allotted up to seven months for interagency review, because of the need for five separate reviews—one each at both the proposed and final

8

rule stages for Rulemaking #1, Rulemaking #2, and another for the anticipated supplemental proposal. Idsal Decl. ¶¶ 159, 165, 173.

28. EPA's internal review schedule also contemplates unnecessary additional time to reevaluate the contribution threshold it uses at Step 2 of the four-step CSAPR framework, possibly applying a less-stringent one-part-per-billion threshold as opposed to the settled one-percent-of-the-NAAQS threshold used in CSAPR and the CSAPR Update, *see* Idsal Decl. ¶¶103 n.15. EPA should abandon this discretionary effort to roll back the well-established contribution level, an arbitrary attempt to reduce upwind significant contribution by simply raising the threshold without actually reducing any upwind emissions. EPA has never applied this less-stringent threshold under the CSAPR framework for the 2008 ozone NAAQS, *see* Idsal Decl. ¶ 59; has no supporting documentation for doing so now; and could unsettle and undermine even the partial progress made in reducing upwind significant contributions in the CSAPR Update.

29. EPA's proposed bifurcated rulemaking would also unnecessarily lengthen the rulemaking schedule by proposing a total of 165 days—almost five-and-a-half months—for public comments: 45 days for Rulemaking #1, another 60 days for Rulemaking #2, plus another 60 days if a supplemental proposal for Rulemaking #2 is issued. Idsal Decl. ¶ 167.

30. Although New York acknowledges the statutory requirement for public comment and believes an ample public comment period is critical to successful rulemaking, EPA's long-overdue deadline and the ongoing threat to public health

from each day of excess ozone pollution in downwind areas weigh heavily in favor of an expeditious rulemaking process.

31. For example, a 45-day comment period for a single, comprehensive rulemaking is reasonable in this context, and EPA does not demonstrate it is impossible. *See* Idsal Decl. ¶ 181. This timeframe for comments on a comprehensive full remedy—the same timeframe EPA proposes for Rulemaking #1—provides sufficient time to meet the public hearing and comment period requirements of the statute, *see* 42 U.S.C. § 7607(d)(5), and is justified and feasible given the need for an expeditious process to address this long-overdue obligation. *See* Sheehan May 15, 2020 Decl. ¶ 71.

32. EPA's bifurcated rulemaking also adds unnecessary delay by proposing more than ten weeks total for review of comments: two weeks for Rulemaking #1 and then a month each for Rulemaking #2 and any supplemental proposal. Idsal Decl. ¶ 168. In my professional experience, eight weeks is sufficient for review of comments and preparation of responses. Beyond conclusory assertions, *see* Idsal Decl. ¶ 182, EPA has not shown this is impossible.

33. Instead, EPA's timeline proposes overly lengthy timelines for two and possibly three distinct rulemaking phases for preparation of a response to comments document, revised Regulatory Impact Analysis, post-comments technical analysis, and preamble drafting: three months for Rulemaking #1, another six months for Rulemaking #2, and yet another six months for a potential supplemental rulemaking. Idsal Decl. ¶159.

34. EPA's assertions, Idsal Decl. ¶ 182, that the work of reviewing and responding to comments, drafting one or more technical support documents and drafting a final rule cannot be done within the approximately three months I have proposed, *see* Sheehan May 15, 2020 Decl. ¶¶ 75-77, are purely conclusory and do not demonstrate that the timeline plaintiffs have proposed is impossible.

35. As I previously stated, EPA should begin developing the technical support document when it develops the rule proposal. Sheehan May 15, 2020 Decl. ¶ 76. If EPA waits until reviewing comments on the proposal to draft the final technical support document, in my experience, this can be completed in two to three weeks and should be prepared concurrently with EPA's responses to comments document. *Id.* EPA's statements on the number of pages of technical documentation for prior transport rules, Idsal Decl. ¶ 182, do not provide information about the time necessary to prepare those documents, nor demonstrate that the time plaintiffs have proposed for preparation of those documents is impossible.

36. Drafting the final rule should also occur concurrently with preparation of other documents such as technical support documentation and responses to comments, and in my experience can be completed in approximately two weeks. *Contra* Idsal Decl. ¶ 182; *see* Sheehan May 15, 2020 Decl. ¶ 77. The final rule preamble should appear substantially similar to the proposal, and thus EPA will not be starting this task from nothing.

37. Overall, the months EPA has proposed at each stage for these rulemaking steps are individually too long, and EPA has proposed to further expand

11

these unnecessarily lengthy timeframes by going through the process multiple times, with up to three, consecutive, partial—not concurrent or comprehensive—rulemakings.

38. In contrast, plaintiffs' proposed single, comprehensive rulemaking schedule is a reasonable, expeditious approach that will provide the full remedy that plaintiffs have sought—but have been unlawfully denied—for years.

39. EPA's assertion, Idsal Decl. ¶ 183, that promulgation of a complete remedy by March 1, 2021 will not allow implementation of necessary emissions reductions during the 2021 ozone season is simply incorrect. Even if some of the emissions reductions to which plaintiffs are entitled occur in future years, as EPA concedes, many of the emissions reductions expected from EGUs will likely come from running existing control equipment and can be accomplished in the matter of a few months. Idsal Decl. ¶ 13 Indeed, this is EPA's own justification for Rulemaking #1. *Id.*

40. Likewise, large non-EGU sources that have existing emissions control equipment should be able to operate them to reduce emissions within a matter of weeks or months, again providing critical relief to downwind States.

41. Additional longer-term solutions for both EGU and non-EGU sources may also be required to fully eliminate upwind States' significant contributions, such as installation of new catalytic and non-catalytic post-combustion control equipment. As EPA observes, Idsal Decl. ¶ 183, these longer-term solutions may not come into operation until later ozone seasons, but this is no reason to delay even analyzing the

need and requiring them now, so that the installation process begins. Plaintiffs' proposed schedule requires EPA to develop the remedy by the spring of 2021, while EPA's proposed schedule would delay even starting to analyze the need for these additional control measures until just before the 2021 attainment deadline.

42. Thus, EPA would ensure that no full remedy was in place by the 2021 attainment deadline, contrary to *Wisconsin* and *New York*. As a practical matter, this would further delay requirements that these sources begin the permitting and installation of such controls by one or two additional ozone seasons,[1] at tremendous cost to public health in New York.

43. In sum, EPA has proposed a schedule that is unlawful and unreasonably prolonged, while failing to demonstrate the impossibility of plaintiffs' reasonable, feasible and lawful schedule. Plaintiffs' proposed action by October 1, 2020 and final action by March 1, 2021 is feasible and necessary to prevent further harm to New York and the other Plaintiff States.

---

[1] EPA suggests that certain downwind States may avoid reclassification to more severe ozone nonattainment status or receive an extension of their 2021 attainment deadline due to improved air quality in 2020. Idsal Decl. ¶ 184 n.34. But this is extremely unlikely with the exceedances of the 2008 ozone NAAQS that have already occurred during the 2020 ozone season and given the historically unprecedented levels to which ozone would have to decrease in 2020 to lower the three-year, 2018-2019-2020 averages to attainment levels.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

So declared this 18th day of June, 2020.

_____
Michael Sheehan